Filed 8/7/23  In re A.S. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B322404 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 20CCJP02653D |
| Plaintiff and Respondent, | |
| v. | |
| C.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Conditionally affirmed and remanded with instructions.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court removed A.S. from his mother's custody after finding she physically abused him, left him unsupervised for long periods, and has substance abuse issues. Mother tested positive for marijuana throughout the dependency period, displayed minimal insight into the issues that led to removal, and was arrested for a domestic violence incident with her partner. The juvenile court terminated her reunification services. A few months later, mother filed a petition to reinstate her services on the basis that circumstances had changed. The court denied mother's petition, terminated parental rights to A.S., and selected the child's caregiver as his prospective adoptive parent.

On appeal, mother argues the court erred in denying her petition and refusing to grant her request for a continuance and bonding study. She also argues the Los Angeles County Department of Children and Family Services (the Department) failed to comply with its duty of initial inquiry under state law (Welf. & Inst. Code, § 224 et seq.) implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) when it did not ask extended family members if the child had Indian ancestry.[1] The Department does not contest remand for

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do the same for consistency, although we recognize other terms are preferred. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

compliance with ICWA.  We accept the Department's concession and conditionally affirm the termination of parental rights but remand the matter for the limited purpose of ensuring compliance with ICWA and related California law.  We affirm the court's other orders.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

**1.  *Investigation and detention***

In April 2020, the Department received a report that mother was physically abusing and neglecting three-year-old A.S. and his younger half-sister, A.C.[3]  At the time, mother was living in a transitional housing facility.  During the Department's investigation, a social worker observed A.S. had bruises on his body, a mark on his forehead, a "red hand print" on his arm, and "scratch-like scars" on both forearms.

A resident at mother's facility told the Department she saw mother "sock[ ]" A.S. in the face, slap him multiple times, pinch him, and twist his arm.  The resident said that when she babysat the child, he acted "scared all the time" and would "cry nonstop" when mother returned.  Other residents reported that mother called the child derogatory names, threw shoes at him, "pulled him down by his hair and pinched him," and left him unattended in a car for at least 30 minutes while she fought with another resident.  The residents also suspected mother was using drugs, because she had recently thrown up in the restroom while naked.

---

[2]  Father did not participate in the dependency proceedings, nor did he appeal the court's orders.  Accordingly, we do not discuss the facts related to father.

[3]  This appeal does not concern A.C.  Therefore, we do not discuss in detail the facts related to A.C.'s dependency case.

Staff at the facility denied witnessing abuse but said there was an incident where A.S. was walking around the facility unattended at 1:00 a.m. Another time, staff said, mother attempted to attack a resident while holding A.C. in her arms.

Mother denied abusing A.S. and claimed she had not used marijuana for two years. Mother said she was prescribed psychiatric medication, but she stopped taking it after suffering an allergic reaction. Mother told the Department she was on probation for an assault with a deadly weapon conviction, but she did not provide details about the conviction. Mother's probation officer said she had offered mother services for years, but mother had refused them.

At the Department's request, the court detained A.S. and A.C. from mother. The court ordered the Department to place the children with the same caregiver, which it did. The Department noted that A.S. was "extremely attached" to A.C., as A.C. was the only "constant person" in his life.

After the Department detained A.S., mother confronted residents at her facility who spoke to the Department, telling them she " 'knew where they stayed and that they were on paper.' "

Mother agreed to drug test for the Department. She was a "no show" five times before testing positive for cocaine and marijuana in July 2020. Mother admitted using marijuana but denied using cocaine. She failed to appear at her next six drug tests.

A.S.'s therapist reported the child fights with his peers, has a lot of energy, and has difficulty following directions and focusing. She recommended he receive mental health services and be evaluated for an IEP. The Department reported that

4

A.S. has limited speech and exhibits severe aggressive behaviors towards other children. The Department said he was in "dire" need of a regional center evaluation, but mother would not return the regional center's calls.

In September 2020, mother's significant other, Oscar, was arrested for intimate partner violence with injury. Mother told the police that Oscar grabbed her by the hair, punched her, and grabbed her throat. Mother said she had been involved in six prior domestic violence incidents with Oscar, one of which A.S. witnessed. She claimed Oscar is a gang member.

## 2. *Jurisdiction and disposition*

The Department filed a petition asserting A.S. is a person described by section 300. The petition alleged mother physically abused A.S., failed to supervise him, engaged in domestic violence in his presence, abuses marijuana and cocaine, and has unresolved mental health issues. As to the physical abuse, the petition specifically alleged mother struck A.S. in the face with a fist, struck his face and body with her hand, pinched and twisted his arm, grabbed him, threw shoes at him, and pinched his ears. The petition further alleged mother left A.S. without adult supervision in a vehicle and allowed him to wander alone in a hallway late at night.

The court held a jurisdiction hearing in September 2020, at which it sustained the allegations related to mother's physical abuse, failure to supervise, and substance abuse. The court struck the remaining counts—which concerned domestic violence and mother's mental health issues—for lack of evidence.

As to disposition, the court declared A.S. a dependent and removed him from mother's custody. The court ordered the Department to provide mother with reunification services

and monitored visitation. Mother's case plan required that she participate in a drug program, submit to drug testing, attend individual counseling to address case issues, and take all prescribed medication.

### 3. *Six-month reunification period*

Mother did not drug test during the initial reunification period, but she did enroll in a parenting class. Asked what she had learned from the classes, mother replied she was becoming more social and had improved her patience. Asked how she disciplines A.S., mother claimed she had no need to because A.S. listens to her when she speaks firmly. Mother became upset when the case worker mentioned the sustained allegations related to her use of corporal punishment. Mother insisted the women at the transitional housing facility had fabricated the stories.

A parent partner—who was working with mother on parenting strategies—said mother actively participates in lessons, but " 'something does not connect' " with her.

In February 2021, the Department placed A.S. with A.C.'s paternal grandmother, who agreed to care for both children. The caregiver reported that A.S. had been displaying aggressive behavior, hitting his sibling, and breaking toys for no reason. A.S. also falsely accused others of hitting him.

Mother visited A.S. throughout the initial reunification period, and A.S. was excited to see her. A monitor described mother as "consistent, loving, caring, responsive and engaging with the children" during visits.

The caregiver said A.S. returns from visits with mother "very aggressive" and he "struggles on the two following days." One time, mother told A.S. she was going to "kick [his] butt"

the next time she saw him.  A.S.'s therapist suggested the child's behavior might improve if he did not see mother for two weeks.

The court held a six-month review hearing on March 22, 2021.  The court found mother was not in compliance with her case plan and declined to return A.S. to her custody.  The court continued mother's reunification services for six months.

4. *Twelve-month reunification period*

During the next reunification period, mother started a new job, obtained housing, and became pregnant with Oscar's child.  Mother was arrested on May 29, 2021 for assault with a deadly weapon.  The Department later learned that Oscar was the victim and had called the police on mother.  The police advised Oscar to get a restraining order against her.

Mother continued to participate in services.  As of August 2021, she had attended eight individual therapy sessions.  The therapist, however, refused to provide the Department substantive information related to mother's progress, citing confidentiality.  Mother had been prescribed medication, but she reportedly stopped taking it because it made her sleepy.

Mother's parenting instructor said it was difficult working with mother and she was not attending sessions as frequently as she had originally agreed.  The instructor said mother had not implemented what she had learned in class during her visits with A.S.  She said mother does not know how to process her anger and does not know how to communicate appropriately with her children.

Mother continued to participate in a drug treatment program.  However, between March and August 2021, she appeared at only two weekly drug tests.  She tested positive for marijuana both times.

Mother visited A.S. consistently, but she missed two visits due to her arrest. Her visits remained monitored. The caregiver reported that A.S. continued to display aggressive behavior and tantrums, but his behavior was improving.

The court held the 12-month review hearing on September 22, 2021. Minor's counsel and the Department asked the court to terminate mother's services. The court found mother was in partial compliance with her case plan, and it continued her services until the 18-month deadline.

5. ***Final reunification period and termination of services***

During the final reunification period, mother told the Department she had been sober since learning she was pregnant. Mother said she had stopped taking her psychiatric medication due to her pregnancy.

Mother continued attending parenting classes, which she completed in mid-November 2021. It was reported that mother struggled to understand the material taught to her in the classes.

Mother also continued with her substance abuse treatment program. She tested negative for drugs throughout September and October 2021. She missed a test on November 3, 2021. At a make-up test the next day, she tested positive for marijuana. Mother said she tested positive because she had been using a "CBD pen," which she had since stopped using.

Mother had attended 19 individual therapy sessions as of mid-November 2021. Mother's therapist said she was engaged during treatment, had gained insight regarding case issues, and was making progress towards her treatment goals.

The Department reported that mother had made inappropriate comments to A.S. during monitored visits.

8

At one visit, mother told A.S. he would be coming home and she would buy him things when he did. During another visit, mother asked A.S. if he was still hitting other children at school. When A.S. said yes, mother replied, "That's my boy."

The court held the 18-month permanency review hearing on November 19, 2021. Mother urged the court to return A.S. to her custody because she had made significant progress on her case plan, including by obtaining appropriate housing, regularly attending therapy, participating in a drug program, and testing negative for drugs. Alternatively, she asked the court to continue her services. Minor's counsel also asked the court to extend mother's services.

The court found mother had made only partial progress on her case plan, and it terminated her reunification services. The court noted that mother's progress had been slow, and it was not clear when she could progress to unsupervised overnight visitation.

### 6. *Post-termination of services*

Mother was a "no show" at all the drug tests after the court terminated her services. She continued to have monitored weekly visits with A.S. A.S.'s caregiver said mother seemed stressed, but the visits had gone well and mother had been appropriate. During a Thanksgiving visit, mother told the caregiver she was sad because her significant other, Oscar, had overdosed on drugs and was in the hospital. Another day, mother told the caregiver she would rather A.S. go back into foster care than have the caregiver adopt the child.

The Department recommended A.S.'s caregiver adopt the child. It reported that A.S. was well cared for, received stability and structure, and had developed a positive and healthy

relationship with the caregiver. A.S.'s behavior had improved greatly and his tantrums had decreased. The caregiver continued to provide "excellent care" and was ready to move forward with adoption.

**7.**    ***Mother's section 388 petition***

On May 24, 2022, mother filed a section 388 petition seeking to change the court's order terminating her reunification services. Mother argued there were changed circumstances in that she had secured appropriate housing, completed a substance abuse and behavioral outpatient treatment program, consistently tested negative for drugs, met her therapy goals, and had given birth to another child. She urged the court to order A.S. placed in her home or, alternatively, grant her additional reunification services and unmonitored visitation. Mother argued the change would be in A.S.'s best interest because she had maintained her relationship and bond with the child, A.S. still considered her to be his mother, and being with a biological parent is "always more beneficial" so long as the parent is able to provide a safe home.

Mother attached to the petition a March 2022 rental agreement, a letter stating she had completed a substance abuse program in December 2021, proof of consistent negative drug test results since March 23, 2022, and a letter stating she had met her individual therapy treatment goals after completing 24 sessions.

The Department opposed the petition and recommended the court terminate mother's parental rights. The Department reported that, although mother and A.S. had a bond and positive interactions, the visits had not "contributed to substantial emotional attachment between the mother and the child." According to the Department, A.S. had been referring to his

10

caregiver as " 'mom' " for the past six months. Mother told A.S. not to call the caregiver " 'mom' " and instead use that term for her. A.S. responded that the caregiver is his mother.

A.S. visited mother in her new apartment sometime around May or June. A.S. was upset after the visit because mother did not have anything for him at her apartment, as she had promised him before. After the visit, A.S. told the caregiver mother " 'doesn't love me anymore.' " As the caregiver comforted A.S., he called her " 'mom' " and said, " 'I love you so much.' "

The caregiver said A.S. exhibited "difficult behavior" whenever he had brief unsupervised time with mother. During a monitored visit in July 2022, the caregiver left A.S. alone with mother momentarily. After the visit, A.S. said " 'mom was bad' " and told him " 'to hate grandma and be bad with grandma.' " A.S. sometimes referred to the caregiver as grandma. A.S. then hugged the caregiver and said he loved her. The caregiver told the Department she was concerned that mother's conduct would cause A.S. to regress.

The caregiver reported that mother had instructed A.S. to destroy objects and throw tantrums with the caregiver, in the hopes that the Department would return the child to mother's care. The caregiver also reported the quality of visits had recently declined, as mother stopped engaging and responding to the child. Mother seemed to be tired from her pregnancy, and she would just give A.S. a phone to play with during visits. A.S. became less interested in visits, and he would sometimes hide from mother during video calls.

Mother consistently tested negative for drugs during this period. She was a "no show" for two tests in June and one test in July 2022. She appeared for a single make-up test in July.

11

Mother's parenting class facilitator said mother completed the parenting class in November 2021.  The class was supposed to be six weeks, but it took mother more than a year to complete it.  The facilitator said it appeared that mother was involved in her classes, " 'gave insight,' " and seemed to have a good grasp of the concepts.

One of mother's neighbors said she was concerned about the child in mother's care.  She did not want to say more, however, because mother had confronted her in the past about talking to the Department.

The Department interviewed mother in connection with her section 388 petition.  Mother told the Department " 'everything changed' " since she got pregnant with Oscar's child.  Mother said going through the classes had helped her to realize the children are her responsibility.  She stopped therapy in January 2022 because she and her therapist did not think she needed any more sessions.

Mother admitted she was a " 'heavy user' " of marijuana in the past, but she claimed to have been sober since July 2021.  She said she previously used marijuana because "the people she associated herself with used marijuana."  She attributed her drug use solely to her environment.  Mother acknowledged that Oscar continues to use marijuana, but she said it did not affect her sobriety because he did not use it near her.  One of mother's neighbors, however, told the Department she saw Oscar smoking marijuana outside mother's apartment every day.

Mother said her mental health had improved greatly and she did not have any more symptoms.  She said she stopped taking medication when she was pregnant.  She had scheduled a follow-up psychiatric appointment for August 2022.

The Department asked mother about her May 2021 arrest. Mother claimed she " 'got into it with a bartender' " and the incident did not involve Oscar. Mother remained silent when the investigator told her the police had reported that Oscar was the victim. Mother denied domestic violence, but she said she and Oscar sometimes had loud arguments. Mother had enrolled in a domestic violence class and convinced Oscar to do the same.

The Department asked mother's case manager why mother had decided to enroll in a domestic violence class. The case manager stalled and then refused to provide a meaningful answer.

## 8. *Denial of mother's petition and termination of her parental rights*

The court considered mother's section 388 petition at a hearing on August 1, 2022. The Department urged the court to deny the petition because mother was not taking her psychotropic medication, it was apparent she was not being honest about her history of domestic violence, and she continued to associate with Oscar, who uses marijuana.

Minor's counsel asked the court to reinstate mother's services for six months. Alternatively, counsel asked the court to delay the permanency planning hearing pending a bonding study. Counsel argued a bonding study was warranted because counsel's investigator had observed a visit at which mother brought toys and A.S. was engaged. According to counsel, the investigator's observations contradicted the Department's reports that there was not a bond between mother and A.S.

Mother asked the court to grant the petition and order A.S. returned to her home. She pointed to her completion of parenting and drug programs, consistent negative drug tests, and stable

housing.  Mother asserted she was not in a relationship with Oscar; they were simply co-parenting their child.  She argued granting the petition would be in A.S.'s best interest because the child lived with her for the first three years of his life, he was always happy to see her during visits, mother maintained the role of a parent, and she was consistent and responsive during visits.  Alternatively, mother joined in minor's counsel's request for a continuance and a bonding study.

The court denied mother's petition.  The court found that, although circumstances were changing, they "have not changed to the level where it would be appropriate to grant her 388, nor would it be in the child's best interest."  The court explained that A.S. has been in a stable and secure home for a significant period, and he clearly is bonded with the caregiver and A.C.  The court expressed skepticism about mother's ability to reunite with A.S. after six additional months of services.  It also noted the record suggests mother had not resolved her domestic violence issues.

After denying mother's petition, the court turned to the issue of permanency planning.  The court found A.S. is adoptable, his bond with mother was insignificant, and the bond was outweighed by the physical and emotional benefit the child would receive through adoption.  The court concluded adoption was in A.S.'s best interest and no exceptions to adoption existed.  The court then terminated parental rights to A.S. and designated A.S.'s caregiver as his prospective adoptive parent.  The court did not address mother's requests for a continuance and bonding study.

Mother timely appealed the denial of her section 388 petition and the court's order terminating parental rights to A.S.

## DISCUSSION

### 1. *The court did not abuse its discretion by denying mother's section 388 petition*

Mother argues the court erred by denying her section 388 petition. Mother contends she demonstrated changed circumstances—not just " 'changing' " circumstances—and that granting the petition would be in the child's best interest.

#### a. *Relevant law and standard of review*

Section 388 allows a parent of a dependent child to petition the juvenile court to change, modify, or set aside its prior orders. (§ 388, subd. (a)(1).) Section 388 was designed as an " ' "escape mechanism" ' . . . [to] allow[ ] the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) It affords a parent a last opportunity for continued reunification services prior to the final resolution of custody status. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.)

At the hearing on a section 388 petition, the parent has the burden to prove (1) the existence of new evidence or changed circumstances justifying a change in the juvenile court's prior orders, and (2) the proposed change would promote the best interests of the child. (*In re A.A.* (2012) 203 Cal.App.4th 597, 611; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1216–1217.)

"Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re A.A., supra,* 203 Cal.App.4th at p. 612.) Generally, this means the change in

15

circumstances must remove or ameliorate the problem that led to the prior order.  (*Ibid*.)

When considering the best interests of the child, the court must take into account that " '[a]fter the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount.  [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability.  [Citation.]' " (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 828.)  As a result, a parent at this stage must establish how the requested change will advance the child's need for permanency and stability.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

We review the denial of a section 388 petition for abuse of discretion.  (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.) An abuse of discretion occurs when the juvenile court exceeds the bounds of reason by making a determination that is arbitrary, capricious, or patently absurd.  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 637, fn. 6.)

b.      *Application*

Mother insists the court erred by finding insufficient changed circumstances to warrant granting her petition. According to mother, she showed changed circumstances by remaining sober for 270 days, completing drug and parenting programs, obtaining stable and appropriate housing, meeting her therapeutic goals, and regularly visiting A.S.

At the outset, it is not clear that all of the circumstances mother cites actually changed after the termination of her services.  For example, mother completed a parenting program in November 2021, before the court terminated her services.

Similarly, at the 18-month review hearing, mother cited the fact that she had obtained appropriate housing as a reason the court should return A.S. to her custody. Although it appears mother moved into a different apartment after that hearing, she does not explain why that fact constitutes the sort of changed circumstances that would warrant the court reinstating her services or returning A.S. to her custody. Nor does she explain why her continued visitation with A.S. warranted a finding of changed circumstances. If anything, the record shows the quality of the visits deteriorated over time, which would weigh against extending her services or returning the child to her care.

With regards to mother's substance abuse issues, the record does not support her contention that she had remained sober for 270 days. In support, mother points to the fact that she did not have a positive drug test after the court terminated her services in November 2021. While true, mother overlooks the Department's report that she was a "no show" at every test between the termination of her services and March 22, 2022. She also was a "no show" for three tests in June and July 2022, at least one of which was unexcused. The court reasonably could have inferred that mother did not appear for those tests because she knew she would have tested positive. (See *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384 ["a missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result' "].)

The record also supports a finding that mother's completion of a substance abuse program and therapy did not constitute the sort of changed circumstances that would warrant relief. Although mother participated in services for more than a year, she displayed a severe lack of insight into the issues that led

17

the court to remove A.S. from her custody. Mother, for example, never acknowledged that she had physically abused the child, despite the reports from multiple eyewitnesses and the physical evidence of abuse on the child's body. Nor did mother ever acknowledge having used cocaine, despite testing positive for the drug. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Even when mother demonstrated some insight into the issues that led to removal, the record indicates she failed to apply those insights. For example, mother acknowledged her past marijuana use was tied to her "environment" and association with other people who used drugs. Nevertheless, she continued to associate with Oscar, who frequently used marijuana and was hospitalized after overdosing on drugs.

While mother's continued efforts to comply with her case plan are commendable, they fail to demonstrate the removal or amelioration of the problems that led to her loss of custody and the termination of reunification services. On this record, the court reasonably could have concluded mother failed to demonstrate changed circumstances sufficient to warrant her requested relief.

Even if mother had shown a sufficient change in circumstances, the juvenile court reasonably denied mother's petition on the basis that her requested changes would not be in A.S.'s best interest. Given mother had never progressed beyond monitored visitation, she clearly was not in a position to take immediate custody of A.S. Nor is it apparent that an additional six months of services would have had a significant chance of leading to reunification. As of the hearing on her petition, mother had participated in services for more than

18

a year, including substance abuse programs, individual counseling, and parenting classes. Nevertheless, as discussed above, she failed to demonstrate meaningful insight into the most significant issues that led the court to remove A.S. from her custody.

The court also was rightly concerned about mother's relationship with Oscar. The record shows mother and Oscar were involved in at least two serious incidents of domestic violence, one of which led to mother's arrest. However, when the Department questioned mother about her arrest, she lied and claimed she got in a fight with a bartender. The record also shows Oscar has serious, unresolved substance abuse issues, increasing the likelihood that mother will relapse.

There is also abundant evidence that visits with mother —and the continued uncertainty around reunification—were having a negative effect on A.S.'s behavior and emotional wellbeing. According to A.S.'s caregiver, the child's behavior regressed after some visits with mother, and the child's therapist even suggested he not see mother for two weeks. The Department also reported that mother made inappropriate comments during the visits, including encouraging A.S. to be aggressive with other children and to misbehave with his caregiver.

In contrast to the uncertainty surrounding mother's ability to care for A.S., the child's caregiver had been providing a stable and supportive environment for a year and a half. The Department reported that A.S. had bonded to his caregiver, referred to her as "mom," and frequently expressed his love for her. The caregiver was meeting all of A.S.'s needs, his behavior had improved significantly while under her care, and

she was committed to providing A.S. a permanent and stable home through adoption. By all accounts, A.S. was thriving in his placement.

Mother contends this case is analogous to *In re J.M.* (2020) 50 Cal.App.5th 833. In that case, the mother presented "ample evidence" that she had addressed the basis for jurisdiction as well as every other concern the court cited in terminating reunification services. (*Id.* at p. 846.) The juvenile court nevertheless denied the mother's section 388 petition, citing her lack of training to care for the child's special needs, despite never having required the mother to participate in such training. (*Id.* at pp. 849–850.) In holding the juvenile court abused its discretion, the appellate court explained the lower court "did not have discretion to write off Mother as a parent entirely, or to force her to prove an above average level of parental ability in order to meet her burden of establishing it was in her son's best interests to have a chance of being raised by his biological mother." (*Id.* at p. 850.) Here, there is nothing in the record even to suggest the court required something similar of mother. True, the court cited concerns about domestic violence, which was not a basis for jurisdiction. However, it is apparent this was not the only reason the court denied mother's petition.

Mother's reliance on *In re Kimberly F.* (1997) 56 Cal.App.4th 519 is also misplaced. There, the court removed the children due to their mother's "dirty and unsanitary" home. (*Id.* at pp. 521–522.) The appellate court reversed the denial of the mother's section 388 petition, finding evidence she had made her home "clean and safe," although still cluttered, showed she had removed the reason for the dependency. (*Id.* at pp. 521–523.) Here, mother's circumstances are entirely different. As the

20

*Kimberly F.* court noted, a dirty home is not "as intractable a problem as a parent's drug ingestion, or physical . . . abuse." (*Id.* at p. 532.) Nor is it anywhere near as serious as recurring domestic violence. Considered with all the other circumstances, mother's severe lack of insight into those issues provided a sufficient basis for the court to deny her petition.

2. ***The court did not err by implicitly denying mother's requests for a continuance and bonding study***

Mother contends the juvenile court erred by denying her request to continue the permanency planning hearing and order a bonding study.

"In a hearing to terminate parental rights in a dependency proceeding, the primary issue often is whether the parents can establish that the child would benefit from a continuing relationship with them and that termination of parental rights would therefore be detrimental to the child. [Citation.] In attempting to establish or eliminate this exception to the preference for adoption, the parties or the court may require a bonding study to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869.) Our Supreme Court recently noted that bonding studies can be informative for courts when determining whether the parental-benefit exception to adoption applies. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 632–633 & fn. 4.) The high court advised juvenile courts seriously to "consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4.) We review a juvenile court's denial of a request for a bonding study for an abuse of

discretion.  (See *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.)

We also review an order denying a continuance for an abuse of discretion.  (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.)  We do not disturb the court's ruling unless its decision was arbitrary, capricious, or patently absurd and resulted in a manifest miscarriage of justice.  (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.)  Courts may continue dependency proceedings only if the delay is not contrary to the child's interests and only on a showing of good cause.  (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810.)  In exercising its discretion and "considering the minor's interests," the statute requires the court to "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1).)  Continuances are expressly discouraged and meant to be difficult to obtain.  (*Elijah V.*, at p. 585; *Ninfa S.,* at pp. 810–811; *Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242–1243.)

Here, mother argues reversal is required because the court refused to exercise its discretion by failing to rule on her requests.  True, the court did not explicitly deny mother's requests.  Nevertheless, it did so implicitly by terminating mother's parental rights and selecting adoption as the permanent plan.  Mother provides no authority that a court must explicitly deny requests for a continuance or a bonding study.  Moreover, absent some affirmative indication in the record that the court misunderstood the scope of its powers or otherwise refused to

exercise them, mother has not shown the court failed to exercise its discretion.

Mother alternatively argues the court abused its discretion by denying her requests. Once again, we disagree. It is not clear, and mother has never meaningfully explained, why a bonding study would have been helpful given she did not argue for the existence of the beneficial parent-child relationship exception to adoption. Nor has mother explained why she waited until the hearing to request the study for the first time. Mother apparently relied on minor's counsel's remark that an investigator had observed mother bring toys to a visit and that A.S. was engaged. The Department, however, noted similar observations in its reports during the reunification period, and there is no indication that the visits meaningfully improved after the court terminated mother's services. Mother could have cited those reports to request a timely bonding study. Instead, she waited until the last minute to do so, when ordering the study would have required a continuance and delayed permanence for A.S. Under these circumstances, the court reasonably could have found mother's last-minute requests were little more than a stalling tactic and not in A.S.'s best interest. (See *In re Richard C.*, *supra,* 68 Cal.App.4th at p. 1197 ["While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process."].)

Mother's reliance on *In re Mary B.* (2013) 218 Cal.App.4th 1474 is misplaced. In that case, the parent argued the court abused its discretion by granting minor's counsel's request for a continuance. (*Id.* at pp. 1480–1481.) Here, in contrast, the

23

issue is whether the court abused its discretion by failing to grant a continuance. That the juvenile court in *Mary B.* acted within its discretion in granting a continuance says nothing about whether the juvenile court in this case was compelled to do the same. Accordingly, *Mary B.* provides no help to mother.

3. ***We remand the case for compliance with ICWA***

Before the detention hearing, mother and father each submitted a Judicial Council form ICWA-020, Parental Notification of Indian Status, indicating they have no reason to know A.S. is an Indian child. Based on those forms, the court found it had no reason to know A.S. is an Indian child. The record does not reflect that the Department performed any further inquiry into the issue.

Under California law implementing ICWA, when the Department takes a child into its temporary custody, its duty of initial inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b); *In re Benjamin M., supra*, 70 Cal.App.5th at p. 742; see also *In re Darian R.* (2022) 75 Cal.App.5th 502, 507.) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

Mother argues the Department failed to comply with its inquiry duty under ICWA by not interviewing A.S.'s extended family members. She contends it was particularly important that the Department interview extended family members given

24

mother was not raised by her biological parents and had limited contact with them.[4]  (See *In re Y.W.* (2021) 70 Cal.App.5th 542, 548, 552–553 [the Department was required to interview extended family members where the mother was adopted and had no information about her biological relatives].)  Therefore, mother urges us to remand the case for the Department to make a meaningful effort to inquire of extended family members as to whether A.S. is, or may be, an Indian child.  The Department does not oppose remand "for the purpose of making the appropriate ICWA inquiry."  We accept the Department's concession, conditionally affirm the judgment, and remand the case for the Department to comply with its inquiry duties under ICWA.

## DISPOSITION

We affirm the denial of mother's section 388 petition.  We conditionally affirm the court's orders terminating parental rights to A.S.  The case is remanded to the juvenile court to order the Department immediately to comply with the inquiry provisions of Welfare and Institutions Code section 224.2, consistent with this opinion, and update the court on its investigation within 30 days of the remittitur.  After ensuring the Department has complied with the inquiry—and, if applicable, notice—provisions of ICWA and related California law, the juvenile court shall determine whether ICWA applies.  If the court determines ICWA does not apply, the orders terminating parental rights shall remain in effect.  If the court

---

[4]  Mother told a social worker she was placed in foster care when she was five years old and adopted two or three years later.  According to mother, her father committed suicide and her mother was deported to Mexico.

25

determines ICWA does apply, it shall vacate its orders terminating parental rights and proceed in conformity with ICWA and related state law.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

ADAMS, J.